UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN E. QUIRK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19-cv-00217-JCN |
| | ) | |
| VILLAGE CAR COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

**DECISION AND ORDER ON CROSS-MOTIONS FOR JUDGMENT**

In this action, Plaintiff alleges that Defendant violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 et seq., and related regulations by reducing payments to him under a deferred compensation plan, by paying his benefits weekly instead of quarterly, by failing to provide written notice of the reduction, and by failing to provide requested information regarding the reduction. Each party filed a motion for judgment on the record. (Motions, ECF Nos. 16 & 17.)

Following a review of the record and after consideration of the parties' arguments, the Court dismisses Plaintiff's motion for judgment on the record, dismisses Defendant's motion for judgment on the record, and dismisses Plaintiff's complaint.

**THE ADMINISTRATIVE RECORD**

Plaintiff entered into a Cross Purchase Agreement (the Agreement), effective January 1, 2005, with his five sons. (Admin. R. 8.)[1] Under the Agreement, each of

---
[1] "Admin. R. __" refers to the pages as they are designated in the administrative record filed on October 30, 2019. (ECF No. 14.)

Plaintiff's five sons purchased an equal amount of Plaintiff's ownership interests in Defendant and five of Defendant's affiliates. (*Id.*)

The purchase price was paid in the form of five equal Promissory Notes ("Note" or the "Notes") delivered to Plaintiff at closing (which was deemed January 1, 2005), with each Note payable to Plaintiff in 140 monthly installments commencing January 1, 2005 and continuing through August 1, 2016. (Admin. R. 8, 10, 15.) In accordance with the Agreement, Defendant and Plaintiff also entered into an Employment Agreement effective January 1, 2005, for the employment of Plaintiff by Defendant from January 1, 2005, until the Notes were paid in full. (Admin. R. 8, 10, 17.) Pursuant to Section 10 of the Employment Agreement, Defendant also adopted a plan of deferred compensation for the benefit of Plaintiff, and Plaintiff agreed to the terms of that plan (the "Plan"). (Admin. R. 19, 22.)

The Plan provides for payments of deferred compensation to Plaintiff starting in September 2016, when his employment with Defendant ceased and the Notes were paid in full.[2] The Plan is maintained by Defendant exclusively for the purpose of providing deferred compensation for one management employee, specifically, Plaintiff. (Admin. R. 22.) The Plan provides that Plaintiff is entitled to a "Maximum Benefit" of $1,776,000 of deferred compensation payable to him in a series of twenty (20) quarterly payments of $83,250 and one final quarterly payment of $111,000. (Admin. R. 22 (§ I.E), 23 (§ II.D.). The payments were made weekly, rather than quarterly, which process evidently was

---

[2] The Notes were paid in full, with interest, on August 1, 2016. (Admin. R. 17 (§ 2), 22 (§ I.A), 23 (§ II.D), 29, 33, 37, 41, 45.)

initially acceptable to Plaintiff. (Admin. R. 2, 46-57, 64.) The Plan provides no benefit other than the payment of deferred compensation. (Admin. R. 22-25.)

Plaintiff received weekly payments of approximately $6,400 (gross) from September of 2016 until August 30, 2018, for the pay period ending August 26, 2018. (Admin. R. 53, 46-55.) On September 6, 2018, for the pay period ending September 2, 2018, Plaintiff received a reduced amount of $3,000. (Admin. R. 52.) For the following nine (9) weeks, Plaintiff received reduced amounts of $3,000 per week through October 4, 2018, and $2,000 each week from October 11, 2018 through November 8, 2018. (Admin. R. 52.)

As a result of the reduced payments that started on September 6, 2018, Plaintiff, through counsel, submitted a claim dated October 15, 2018, for benefits due under the Plan (the "October 2018 Claim"), demanding resumption of full weekly payments. (Admin. R. 64.) Defendant notified Plaintiff, through counsel, that the Plan accepted the October 2018 Claim as a written claim for benefits due pursuant to Section V(A) of the Plan. (Admin. R. 66.)[3]

Section V of the Deferred Compensation Agreement sets forth the Plan's claims procedure. (Admin. R. 24.) The Plan calls for the initial review of a claim by the Defendant through the office of its President, and if Defendant "partially or wholly denies the claim," Defendant is required to set forth the specific reasons for the denial, and to provide certain

---

[3] John J. Quirk ("Quirk Jr."), on behalf of Defendant, informed Plaintiff through counsel in October 2018, and later directly, that the reason he decided to reduce payments to his father in September 2018 was that he hoped to convince Plaintiff to meet with him to discuss some family matters. (Admin. R. 2-3, 108, 113, 168-70, 193.)

additional information to the claimant as required under ERISA's claims procedure regulation, 29 C.F.R. § 2560.503-1. (*Id.*) Plaintiff may then request a second level review of such denial or partial denial of the claim by submitting that request, again, to the office of the President of Defendant, at which point the Board of Directors of Defendant would appoint a so-called "Reviewing Officer" to review and decide the claim upon this second level of review. (*Id.*)

> The Reviewing Officer is vested with
>
> [f]ull discretionary authority (1) to interpret the provisions of this Plan, (2) to make findings of fact necessary or appropriate for the determination of eligibility for benefits under this Plan, and (3) to make determinations of eligibility for benefits or the amount of benefits due under this Plan.

(Admin. R. 25.)

On November 15, 2018, for the pay period ending November 11, 2018, Plaintiff began receiving his regular weekly amount of approximately $6,400. (Admin. R. 52.) On November 29, 2018, for the pay period ending November 25, 2018, Plaintiff received his regular payment of approximately $6,400, plus an additional $39,038.50 to make up for the ten weeks of reduced payments between September 6 and November 8, 2018. (*Id.*)

Plaintiff, who received the payment for the prior arrearage, did not raise the issue again, but raised the issue of quarterly payments a few months later. (Admin. R. 52, 118.) By letter dated January 17, 2019, Plaintiff, through counsel, stated that he "does not agree to weekly installment payments," and he demanded a quarterly payment to him of deferred compensation as of "January 15, 2019," and then another such quarterly payment on April 15, 2019. (Admin. R. 118.)

On January 24, 2019, Tim Ingerson, the previous CFO of Quirk Automotive Group, advised Plaintiff's counsel that if Plaintiff had decided to receive quarterly payments, Plaintiff needed to advise Defendant how to withhold taxes to satisfy his income tax liabilities. (Admin. R. 120.) Mr. Ingerson followed up on January 31, 2019, with a detailed breakdown of the income tax and other withholdings on the weekly installments. (Admin. R. 122.)[4]

In mid-March 2019, Bart Haag, Plaintiff's accountant, believed that he and Mr. Ingerson agreed upon appropriate withholdings for quarterly payments and he thought Quirk Auto Group would make "adjustments in their payroll system" for Plaintiff. (Admin. R. 136.) Counsel for Plaintiff inquired on March 21, 2019, as to the status of an April quarterly payment and Mr. Ingerson asked on March 25th that she "forward to [him] something from Plaintiff acknowledging this change from weekly checks to quarterly payments and approving the Federal and State of Maine withholding amounts as determined by Bart [Haag]." (Admin. R. 137.)

On March 28, 2019, before receiving a response to his request, Mr. Ingerson wrote to counsel for Plaintiff informing her that after he receives Plaintiff's "consent to quarterly payments we will start on the pay date closest to the payment date, which could be couple days before the 15[th] or a couple days after." (Admin. R. 149.) On March 29, 2019, counsel for Plaintiff forwarded by email attachment a document titled "Consent and

---

[4] Mr. Ingerson had previously explained to counsel for Plaintiff that Defendant could not "1099" Plaintiff as she suggested, but is obligated by law to report the deferred compensation payments as W-2 wages and to withhold accordingly. (Admin. R. 124.)

5

Demand for Quarterly Payments" (the "Consent"). (Admin. R. 61-63.) The consent form did not mention the withholdings proposed by Mr. Haag. (Admin. R. 63.)

On April 9, 2019, Mr. Ingerson raised a concern with Plaintiff's counsel regarding Plaintiff's signature on the consent form. Plaintiff stated that he had never seen Plaintiff "sign his last name with a Q in that fashion [as appears on the Consent]." (Admin. R. 60-61.) Mr. Ingerson requested that Plaintiff provide a notarized signature on the form, sign off on the tax withholdings for the quarterly payments, and acknowledge that payments to Plaintiff under the Plan were otherwise current. (Admin. R. 59, 61.) Counsel for Plaintiff did not respond to the requests, and on April 29, 2019, told Mr. Ingerson that Plaintiff "will proceed with enforcement of his contractual rights in a judicial setting." (Admin. R. 154.)

On May 9, 2019, Mr. Ingerson wrote to counsel for Plaintiff, stating that he is "looking out for [Plaintiff]," and that if she

> can not confirm that [Plaintiff] signed the consent in [her] presence then please have [Plaintiff] call me and confirm this change…. This will save you and I time and frustration. It is a very simple request to resolve this issue.

(Admin. R. 154.)

Counsel for Plaintiff responded that same day to Mr. Ingerson that "we have represented to you as attorneys that his signature was notarized." (Admin. R. 153-54.) On May 17, 2019, Mr. Ingerson asked counsel for Plaintiff to resend the notarized Consent to him, and after receipt he would "make sure the payment schedule is changed to quarterly payments [starting in June of 2019]." (Admin. R. 153.)[5]

---

[5] Counsel for Plaintiff stated that she viewed Mr. Ingerson's email as a settlement offer "inadmissible in any court proceeding." (Admin. R. 153.)

On May 29, 2019, Plaintiff served his complaint on the Defendant by service on Christopher Austin, Defendant's corporate clerk. (Admin. R. 199.) As of June 19, 2019, Defendant submitted its payroll for the period ending June 16, 2019, including arrangements for the direct deposit on June 20, 2019, into Plaintiff's account, of the $83,250 quarterly payment due in June. (Admin. R. 56.)

Through correspondence dated July 2, 2019, Plaintiff requested that Defendant reinstate Plaintiff's vehicle stipend, pay $8,500 for economic losses incurred due to the discontinuation of Plaintiff's vehicle stipend in August 2018, and reimburse Plaintiff for attorney fees in the amount of $9,000. (Admin. R. 5-7.) Plaintiff considered this correspondence to be a settlement offer. (Plaintiff's Objection to Defendant's Appendix of Facts, ECF No. 19, ¶ 7.) Defendant treated Plaintiff's correspondence as a claim under Article V(A) of the Plan, which claim it denied. (Admin. R. 1-4, 192-93.)

## DISCUSSION

Plaintiff contends that Defendant violated ERISA by reducing Plaintiff's weekly benefit payments for several months, by failing to pay the benefits quarterly as provided by the terms of the Plan, by failing to provide Plaintiff written notice of the reasons for the reduction of Plaintiff's benefit payments, and by failing to provide information regarding the reduction as requested by Plaintiff. Defendant argues that the temporary reduction of payments to Plaintiff did not constitute a "denial" of a claim by Plaintiff triggering the notice and production of information provisions of ERISA. Defendant also argues that because Plaintiff is no longer employed by Defendant, Plaintiff cannot recover for discrimination under ERISA based on the reduction of his benefits and the payment of the

benefits weekly, rather than quarterly. Finally, Defendant maintains that because Plaintiff's benefit payments are current and being made quarterly, Plaintiff is not entitled to any relief under ERISA.

### A. Standard of Review

The standard of review for a claim brought pursuant to ERISA section 502, 29 U.S.C. § 1132(a)(1)(B), depends on the discretion afforded the administrator of the plan. If the benefit plan "grants the administrator 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' [the court] review[s] only to ensure that the administrator's decision is not 'arbitrary or capricious'; if the plan does not grant such discretionary authority, [the court] review[s] benefit decisions de novo." *Campbell v. BankBoston, N.A.*, 327 F.3d 1, 5-6 (1st Cir. 2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109-15 (1989)). In this way, when reviewing the actions of plan administrators in a challenge to a denial of benefits "the district court sits more as an appellate tribunal than as a trial court." *Leahy v. Raytheon Co.*, 315 F.3d 11, 19 (1st Cir. 2002). A court's review, therefore, is based only on the administrative record. *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006).

Here, the Plan provides that the "Reviewing Officer" has "full discretionary authority" to interpret the provisions of the Agreement, make findings of fact for the determination of eligibility for benefits, and make determinations of eligibility for benefits or the amount of benefits due under the plan. (Admin. R. 25, ¶ V(C).) The parties appear to agree that the arbitrary and capricious standard applies. The Court's analysis thus would "focus[] on whether the record as a whole supports a finding that the plan administrator's

decision was 'plausible,' or, put another way, whether the decision is supported by substantial evidence in the record.'" *O'Shea v. UPS Ret. Plan*, 837 F.3d 67, 73 (1st Cir. 2016) (quoting *Niebauer v. Crane & Co.*, 783 F.3d 914, 923 (1st Cir. 2015)).[6]

## B. Plaintiff's Claims Under ERISA Section 503

Plaintiff argues that the reduction in his benefits for 10 weeks operated as a "denial" of his claim for benefits by Defendant and that Defendant failed to comply with the requirements of ERISA to provide notice of the reasons for the reduction. Defendant argues that Plaintiff's October 15, 2018, letter demanding resumption of the full weekly benefits functioned as a claim, which Defendant asserts it did not deny.[7] Defendant argues the temporary reduction in benefits was not a "denial" with respect to notice requirements under section 503.

Pursuant to ERISA section 503, 29 U.S.C. § 1133, every employee benefit plan[8] shall:

---

[6] The arbitrary and capricious standard also applies to plans in which, as here, the administrator both evaluates and pays claims. *Carter v. Aetna Life Ins. Co.*, 2:17-cv-00398-JAW, 2019 WL 80434, at *13-*14 (D. Me. Jan. 2, 2019). The significance of the resultant conflict of interest depends on the particular facts of a case, and is one factor for a court to consider in deciding whether the administrator abused its discretion. *Id*.

[7] Defendant also characterizes a letter from Plaintiff's counsel dated July 2, 2019 (Admin. R. 5-7) as "a written notice of claim for initial review," which Defendant states that it denied. (*See* ECF No. 17-1, ¶¶ 56-65.) Plaintiff, however, maintains the letter is a second notice of claim "and settlement offer." (ECF No. 19 at 4.) Plaintiff agrees that his requests for reimbursement of attorney's fees and a vehicle stipend were properly denied if viewed as a claim under the Plan; Plaintiff states, however, that the requests were part of a settlement offer. (*Id*.)

[8] This includes "top hat" plans such as the one at issue here. *See Hampers v. W.R. Grace & Co., Inc.*, 202 F.3d 44, 46 n.3 (1st Cir. 2000). A top hat plan is "any plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Alexander v. Brigham and Women's Physicians Or., Inc.* 513 F.3d 37, 42 (1st Cir. 2008) (quoting ERISA section 201(2), 29 U.S.C. § 1051(2)). The Plan specifically describes itself as such in its preamble. (Admin. R 22.)

> (1) Provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and (2) Afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

Plaintiff also asserts that Defendant's initial reduction of benefits and subsequent responses to the October 15 and November 26, 2018, letters failed to comply with the notice requirements of section 503 and the regulations implementing section 503, which regulations require a plan administrator to:

> (i) Provide claimants at least 60 days following receipt of a notification of an adverse benefit determination within which to appeal the determination;
> (ii) Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;
> (iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits….

29 C.F.R. § 2560.503-1(h)(1).

First, Defendant's response to Plaintiff's letters protesting the reduction of his benefits did not constitute a denial of a claim under section 503—the weekly payments were restored following the October 15 letter and the arrearage in benefits was paid a few days after the November 26 letter.[9] An issue is thus whether the reduction in benefits from September 6, 2018 through November 8, 2018, was itself a denial of a claim for benefits with respect to which Defendant failed to provide proper notice.

---

[9] Defendant maintains that the payment was already in process when it received Plaintiff's November correspondence.

Some courts have found that a reduction in benefits does not function as a denial that prompts the requirements of section 503 and its implementing regulations. For instance, in *Butler v. Aetna U.S. Healthcare, Inc.*, 109 F. Supp. 2d 856, 863 (S.D. Ohio 2000), the court concluded, "[b]y its unambiguous terms, § 1133 applies only when a claim for benefits under an ERISA plan has been 'denied.'" The *Butler* court found that a plan administrator's withholding of long-term disability payments in order to recoup a previous overpayment was neither the denial of a claim nor the termination of plan benefits. 109 F. Supp. 2d at 864. *See also White v. Coca-Cola Co.*, 514 F. Supp. 2d 1353, 1366 (N.D. Ga. 2007) (same, citing *Butler*). Other courts, however, have found the reasoning in *Butler* and its progeny unpersuasive, noting that the regulations implementing section 503 define an "adverse benefit determination" to be any of the following: "a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit …." 29 C.F.R. § 2560.503-1(m)(4). *See, e.g.*, *Cherene v. First Am. Fin. Corp. Long-Term Dis. Plan*, 303 F. Supp. 2d 1030, 1036 n.1 (N.D. Cal. 2004). Under this reasoning, any reduction in benefits by an administrator would trigger the notice requirements of section 503.[10]

Even if the reduction in payments prompted the written notice requirements of section 503, Plaintiff's claim is moot as he has obtained all the benefits under ERISA to

---

[10] Other courts have found that a reduction in benefits can serve as the precipitating event to start the clock running on the statute of limitations, citing 29 C.F.R. § 2560.503-1(m)(4)'s definition of an adverse benefit determination, reasoning that an underpayment functions as a repudiation of plaintiff's claim for benefits. *See, e.g., Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 521 (3d Cir. 2007) ("Like a denial, an underpayment is adverse to the beneficiary and therefore repudiates his rights under a plan."); *Riley v. Met. Life Ins. Co.*, 744 F.3d 241, 247 (1st Cir. 2014) (same, citing *Miller*); *Novella v. Westchester Cty.*, 661 F.3d 128, 147-48 (2d Cir. 2011) (same, citing *Miller*).

which he is entitled. *Zacharkiw v. Prudential Ins. Co. of America*, No. 10-cv-639, 2012 WL 39870, at *3 (E.D. Pa. Jan. 6, 2012) ("reinstatement of a plaintiff's benefits renders moot a complaint seeking such benefits") (collecting cases). Pursuant to section 502, 29 U.S.C. § 1132(a),

> [a] civil action may be brought— (1) by a participant or beneficiary— … (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; … (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

"ERISA limits the remedies available to plan participants, a well-known and frequently noted reality that Congress has failed to alter." *Mitchell v. Emeritus Mgmt., LLC*, 524 F. Supp. 2d 67, 74 (D. Me. 2007). The relief expressly provided by § 1132(a)(1)(B) "is to secure benefits under the plan rather than damages for a breach of the plan." *Turner v. Fallon Cmty. Health Plan, Inc*. 127, F.3d 196, 198 (1st Cir. 1997). As the First Circuit has stated, "the Supreme Court has stressed that ERISA does not create compensatory or punitive damages remedies where an administrator of a plan fails to provide the benefits due under that plan." *Id*. (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985); *see also Simpson v. Ernst & Young*, 879 F. Supp. 802, 825-28 (S.D. Ohio 1994). Accordingly, to the extent Plaintiff seeks a monetary recovery as the result of Defendant's alleged violation of section 503's notice requirements, the recovery would be limited to the benefits Plaintiff is entitled to under the Plan, which Plaintiff has already

received. Plaintiff is not entitled to either compensatory or punitive damages on this claim and his claim for a monetary recovery is otherwise moot. [11]

To the extent Plaintiff seeks equitable relief, Plaintiff's claim is also moot. The equitable relief provided by section 502(a)(3) "acts as a 'safety net' in ERISA's remedial scheme, allowing an individual to bring a claim for equitable relief when an adequate remedy is not otherwise available under ERISA." *Mitchell*, 524 F. Supp. 2d at 72. Plaintiff has not shown that an order of this Court is necessary to enjoin some act or practice of Defendant that is currently violating the provisions of either ERISA or the Plan, or that Defendant will likely do so in the future. *See Adams v. Bowater Inc.*, 313 F.3d 611, 613–615 (1st Cir. 2002) (examining all of the circumstances for mootness inquiry, including litigation history, intentions, and admission of error). The circumstances here, including the familial motives of the original violation and the pre-litigation resolution of the major issues effectively minimize the likelihood of a repeat occurrence. *See infra*, Part D. Because Defendant is now in compliance with the terms of the Plan and it is clear that the wrongful behavior could not reasonably be expected to recur, the request for equitable relief is moot.[12]

---

[11] Plaintiff also requests restitution of benefits in his complaint (Complaint at 9, ¶ (C)), but has not identified what specific benefits he is seeking.

[12] Plaintiff also argues that because Defendant did not provide the information that he requested regarding the initial decision to reduce Plaintiff's benefits, under section 502(c)(1), 29 U.S.C. § 1132(c)(1), Defendant could be penalized up to $100 per day from the date of Plaintiff's first request. The record establishes that the decision was based on familial issues unrelated to the terms and purpose of the Plan. Furthermore, although Defendant did not offer a written explanation for the reduction, the reduction was rectified. Under the circumstances, the Court discerns no relevant "documents, records, and other information" that Defendant withheld. Notably, ERISA's notice requirements are not meant to create a system of strict liability, and even where an administrator fails to furnish the requisite information, a claimant must show prejudice to gain relief. *Bowden v. Group 1 Automotive, LTD Plan*, 359 F. Supp. 3d 156, 168-69 (D. Mass.

C.   **Plaintiff's Claims Under Section 510**

Plaintiff also claims that Defendant violated ERISA section 510, 29 U.S.C. § 1140, by reducing Plaintiff's weekly benefit payments for 10 weeks and by failing to make the benefit payments quarterly, as provided by the terms of the Plan.

ERISA section 510, 29 U.S.C. § 1140 provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or by statute] or for the purpose of interfering with the attainment of any right to which such participant may become entitled to under the plan [or by statute].... The provisions of section 1132 [ERISA § 502] of this title shall be applicable in the enforcement of this section.

Defendant argues that section 510 does not apply because Plaintiff is no longer an employee of Defendant. "The legislative history [of section 510] reveals that the prohibitions were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980). In other words, "[i]n contrast to § 502, § 510 is designed to protect the employment status of participants and beneficiaries." *Coats v. Kraft Foods, Inc.*, 12 F. Supp. 2d 862, 867 (N.D. Ind. 1998).

Given this legislative purpose, some courts have held that "a fundamental prerequisite to a Section 510 action is an allegation that the employer-employee relationship … was changed in some discriminatory or wrongful way." *Stout v. Bethlehem*

---

2019). Plaintiff was aware of the underlying reason behind the reduction in payments—an effort by Plaintiff's family members to address certain family issues. Though the initial decision to reduce Plaintiff's benefits could arguably constitute an abuse of discretion by Defendant, Plaintiff had actual knowledge of the reason for the reduction, and he has not demonstrated any prejudice due to the lack of a formal, written explanation from Defendant.

14

*Steel Corp.*, 957 F. Supp. 673, 694 (E.D. Pa. 1997) (quoting *Deeming v. Amer. Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir. 1990)). Other courts, however, view "attacks on the 'employment relationship' [not] as a *sine qua non* of § 510 coverage, [but rather] it is more appropriate to view [the] 'employment relationship' as an illustrative but non-exclusive description of a set of rights that are protected by § 510 …." *Mattei v. Mattei*, 126 F.3d 794, 801 (6th Cir. 1997).

Regardless of whether Plaintiff, who is not currently an employee of Defendant, had a claim under Section 510, as explained above, because Defendant has paid the benefits Plaintiff is due under the terms of the Plan and because Defendant is otherwise in compliance with the payment terms of the Plan, Plaintiff's claim is moot.

D. **Attorney's Fees**

Both parties request an award of attorney's fees. Under section 502 of ERISA, the "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Fees are not available, however, for services provided during administrative proceedings to exhaust administrative remedies or otherwise. *Warren v. Cochrane*, 257 F. Supp. 2d 321, 324 (D. Me. 2003).

A party is not required to qualify as a "prevailing party" to recover attorney fees pursuant to § 1132(g)(1). As the Supreme Court recognized, "[t]he words 'prevailing party' do not appear" in § 1132(g)(1), which governs the recovery of attorney fees in ERISA claims. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010). "[A] fees claimant must show some degree of success on the merits before a court may award attorney's fees under § 1132(g)(1). A claimant does not satisfy that requirement by

achieving trivial success on the merits or a purely procedural victory, but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was substantial or occurred on a central issue." *Id*. (internal citations and quotation marks omitted).

The mere fact that Plaintiff's claims are moot does not necessarily preclude a recovery of attorney's fees. As the Court in *Zacharikiw* explained, "[i]f those who moot an ERISA case never bear the risk of paying the allegedly aggrieved party's attorney's fees, those in the insurance industry may be tempted to wrongfully deny claims for benefits and then reinstate benefits (thereby mooting the case) only for those claimants who mount a vigorous challenge to the termination decision…. [a]s a practical matter, this flexible fee shifting regime [under ERISA] would mean little if a defendant could always avoid paying fees simply by mooting the underlying action." 2012 WL 39870, at *5.

The Court understands Plaintiff's concern about Defendant's payment of the benefits. The uncontroverted evidence establishes that Defendant, for personal reasons, and contrary to the plain terms of the Plan, withheld payments from Plaintiff and made payments at a different interval than the Plan required. Plaintiff, however, secured the restoration of the full monetary benefits and full payment of the arrearages before commencement of this action. As explained above, the Court cannot award attorney's fees incurred in the administrative process. *Warren v. Cochrane*, 257 F. Supp. 2d 321, 324 (D. Me. 2003); *see also, Peterson v. Continental Cas. Co.,* 282 F.3d 112, 120-21 (2d Cir. 2002).

Through the administrative process, prior to the commencement of this action, Defendant restored the monetary benefits to which Plaintiff was entitled under the Plan. The only issue remaining when Plaintiff commenced this action was Plaintiff's request for quarterly payments (as provided in the Plan) rather than weekly payments. The record reflects, however, that initially, the weekly payments were acceptable to Plaintiff and that prior to the filing of this action, with the necessary consent from Plaintiff, Defendant was prepared to restore the quarterly payments. Despite Defendant's express willingness to restore the quarterly payments, Plaintiff commenced this action. Shortly thereafter, the quarterly payments were restored.

Because any success Plaintiff achieved in this action would be limited to the restoration of quarterly payments rather than weekly payments, an action Defendant was prepared to take before Plaintiff commenced this action, the Court cannot "fairly call the outcome of the litigation some success on the merits" to warrant an award of attorney's fees. *Hardt*, 560 U.S. at 252. The Court, therefore, denies Plaintiff's request for attorney's fees. The Court also discerns no basis to award Defendant its attorney's fees.

## CONCLUSION

Based on the foregoing analysis, the Court concludes that Plaintiff's claim is moot. The Court, therefore, dismisses Plaintiff's motion for judgment on the record, dismisses Defendant's motion for judgment on the record, and dismisses Plaintiff's complaint. The Court also denies each party's request for an award of attorney's fees.

**SO ORDERED.** /s/ John C. Nivison  
U.S. Magistrate Judge

Dated this 25th day of February, 2020.